**UNITED STATES of America, Appellant,**

v.

**Betty Lancaster SHIVELY, Appellee.**

**No. 20755.**

United States Court of Appeals
Fifth Circuit.

May 17, 1965.

Rehearing Denied June 18, 1965.

John W. Douglas, Asst. Atty. Gen., Washington, D. C., Sampson M. Culpepper, Asst. U. S. Atty., Floyd M. Buford, U. S. Atty., Macon, Ga., Alan S. Rosenthal, J. F. Bishop, Attys., Dept. of Justice, Washington, D. C., for appellant.

Vincent P. McCauley, Columbus, Ga., for appellee.

Before TUTTLE, Chief Judge, WISDOM, Circuit Judge, and CARSWELL, District Judge.

CARSWELL, District Judge.

Betty Lancaster Shively sued under the Tort Claims Act for damages incident to injuries sustained by her as a result of the alleged negligence of agents of the United States in allowing her former husband, Sergeant John Lancaster, to have possession of a weapon, the property of the United States, with which he inflicted injuries upon her in a murderous assault.

Upon full and careful development of the record, about which there is no complaint, the District Court held for Betty Lancaster Shively.

We conclude that the facts of this record show that the negligence of agents of the United States was not the proximate cause of Mrs. Shively's injuries and, therefore, reverse.

Since this case turns on the factual record, a rather detailed examination of the events leading up to the appellee's injury is necessary.

On September 11, 1960, and for several months earlier, John Lancaster was a Sergeant First Class attached to the Field Artillery at Fort Benning, Georgia. Until September 10, the appellee was with his wife. For some time, Lancaster had been having serious financial troubles, which, in turn, had led to marital difficulties. This general situation, and some of the specifics, was known to the sergeant's commanding officer, Captain Neuberger, and to some other members of his military unit. As commanding officer, Captain Neuberger had received several complaints from civilian sources concerning Lancaster's financial difficulties. He had discussed these problems with Lancaster and had helped him prepare a budget.

Due to the family financial troubles, the appellee obtained outside employment. Lancaster objected violently to this, even going to her place of employment and causing such a disturbance that it was necessary for her to quit her job. The appellee then decided to divorce Sgt. Lancaster.

The family situation reached this critical point about midsummer 1960. Sgt. Lancaster related this information to Captain Neuberger, who talked to the appellee in an effort to persuade her to postpone filing the divorce action. He told her that her husband was already greatly upset and that if she did divorce him, this might be the breaking point for him. Appellee then related to the Captain some of the conditions she found unbearable, saying she was afraid of Lancaster and that he had threatened to kill her on more than one occasion. She told him the details of Lancaster threatening

to kill her with an automobile and about his yanking a leg from a table and threatening to beat her with it when he learned she was planning to see an attorney about filing a divorce action. This conversation between the appellee and Captain Neuberger transpired in early August, 1960.

On September 10, 1960, the appellee obtained a divorce from Sgt. Lancaster. At about 7:00 A.M. the following day, a Sunday, Lancaster telephoned the appellee at her home, saying he wanted to come to see her and the children. She said that she did not want to see him, but Lancaster insisted. She told him that if he did come she would call the police. About 7:20 Sgt. Lancaster appeared at the Arms Room at Fort Benning, dressed in civilian clothes, and requested that he be issued a .45 caliber pistol. He stated to Sp/5 John Litts, who was in charge of the Arms Room, that he wanted a pistol to do some target practice. Sp/5 Litts knew that Sgt. Lancaster was on the Weapons Committee and that his duties included instructing recruits in the use and care of small arms. He issued Sgt. Lancaster a .45 caliber automatic pistol that belonged to the United States. At the time the weapon was issued, no one else was present. Lancaster seemed normal to Litts.

About thirty minutes later Lancaster appeared at the door of appellee's residence. When she refused to let him in, he tore the hook from the screen door, broke a glass pane in the front door and opened the door. Taking the .45 automatic out of a paper sack he was carrying, he walked in. Appellee ran to the telephone. Lancaster ordered her to put the 'phone down or he would shoot her immediately. She complied. Lancaster then asked her if she had anything to say before he killed her. She picked up one of the babies. After repeating the question and getting a negative reply, he snatched the baby from her and shot her in the right side. He raised the gun to fire again and appellee begged him to think of the children. Lancaster then shot her in the left side. Appellee collapsed and Lancaster turned the gun on himself and ended his life.

Several Army regulations relating to the security of small arms were introduced in evidence. These documents set out detailed instructions to Army personnel about the storing of small arms and who shall have the responsiblity for their custody and protection from loss, theft, or unauthorized use.

■ It is established that the Army regulations and the custom and practice followed at Fort Benning at the time of the incident prohibited the issuance of a Government owned pistol to an off-duty soldier in civilian clothes without specific orders authorizing such issue. Issuing the weapon under these circumstances was a technical violation of the rules, custom and practice. The District Court found and we agree that Litts was negligent in this regard.

We also agree with the District Court's succinct statement of issue as encompassed by the controlling law of the State of Georgia,

"* * * the paramount question before us is whether the injury to the Plaintiff (appellee) was a result which the Defendant (appellant) might in the exercise of prudence have reasonably anticipated as a natural result of its negligent act

* * * "

■■ On the facts the District Court answered this question in the affirmative holding that the negligence of Sp/5 Litts in issuing the pistol was the proximate cause of the plaintiff's injury. With this conclusion we cannot agree for we conclude that the Georgia rule most clearly applicable here was stated in Andrews & Company v. Kinsel, 114 Ga. 390, 40 S.E. 300, as follows:

"where there has intervened between the defendant's negligent act and the injury an independent illegal act of a third person, producing the injury, and without which it would not have happened, the latter is properly held the proximate cause of the injury * * *. 'The defendant's

negligence may put a temptation in the way of another person to commit a wrongful act * * * yet the defendant's negligence may be in no sense a cause of the injury. * *' "

In that case the defendant owned two storehouses, one of which he had rented to the plaintiff. While making repairs, the defendant removed a partition between the two buildings and then "negligently and carelessly" left two windows open. Later, burglars entered plaintiff's premises through the windows and the opening and stole property belonging to plaintiff. This, the Court held, was not the proximate cause of plaintiff's injury.

Other Georgia cases are to like effect. Belding v. Johnson, 86 Ga. 177, 12 S.E. 304, 11 L.R.A. 53; Skelton v. Gambrell, 80 Ga.App. 880, 57 S.E.2d 694; Hulsey v. Hightower, 44 Ga.App. 455, 161 S.E. 664. In the latter case the Court specifically distinguished the factual situation before it—one involving an intentional and competent criminal act—from that present in Spires v. Goldberg, 26 Ga.App. 530, 106 S.E. 585, upon which the trial Court placed principal reliance.

In the Spires case the defendant had illegally sold a pistol to a fourteen year old minor, who, in turn, lent it to another minor for target practice. While in the second minor's possession, the pistol accidentally discharged and injured the plaintiff. The Court held that the accidental discharge was not such an intervening act as to relieve the defendant from liability as a matter of law. The defendant might well have anticipated the accident as a natural result of his act.

The very purpose of the statutory prohibition against the sale of arms to minors was to guard against such accidents. The defendant there should have been aware of the unreasonable risk to third persons caused by the possession of a lethal weapon by a person who, because of his youth, should not be expected to possess the judgment and experience required in the use of it.

There is a clear rational basis for distinguishing, as the Georgia Courts have done, between an intervening act which is intentional and illegal and an intervening act which is merely the result of carelessness. As noted before, in referring to the Spires case, one may be reasonably held to the realization that, if a minor has possession of a lethal weapon, there is a substantial possibility that it will result in an unintentional injury to others. Conversely, however, as the other Georgia cases cited illustrate, there is no ordinary reason to anticipate that, possessing such an instrument, a person of mature age, even with known financial and marital problems, will use it to commit a murderous assault upon his former wife.

The appellee's case fails for the lack of showing on the record a factual basis to place on the Government's agents, one or any or all of them, an obligation of due care, a reasonable requirement to anticipate or to prevent her former husband from attempting to kill her with a lethal weapon.

▮ From what has already been noted of the facts of this case we also conclude that appellee's claim here is a "claim arising out of assault", which is, in those words, specifically excepted from recovery under the Federal Tort Claims Act, 28 U.S.C. § 2680(h). It is not necessary to the ruling here, and we do not determine whether every assault intervening between a shown negligence of the United States and injury to third parties is barred under the Federal Tort Claims Act by this exclusionary language.

We conclude under the applicable law, that the issuance of the weapon to Lancaster was not the proximate cause of the injury to appellee. Rather the sole proximate cause was the intervening act of Lancaster.

The judgment is, therefore, reversed and this cause is remanded to the District Court for the entry of judgment for the United States.