Frank J. **UNDERWOOD**, as Administrator of the Estate of Shirley Underwood Dunn, Deceased, Appellant,

v.

**UNITED STATES** of America, Appellee.

No. 21924.

United States Court of Appeals Fifth Circuit.

Jan. 26, 1966.

Ira De Ment, Montgomery, Ala., for appellant.

Rodney R. Steele, Asst. U. S. Atty., Montgomery, Ala., Ben Hardeman, U. S. Atty., for appellee.

Before TUTTLE, Chief Judge, and RIVES and GEWIN, Circuit Judges.

RIVES, Circuit Judge.

This action was brought under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671, et seq., in conjunction with the Alabama Homicide Act, Code of Alabama, 1940, Title 7, sec. 123. Edward F. Dunn, an Airman First Class assigned to the Air Police Squadron at Maxwell Field, Montgomery, Alabama, shot and killed his former wife, Shirley Underwood Dunn, on September 4, 1962, at her place of employment in the City of Montgomery. Her father and personal representative in this action claimed that the United States was negligent in the following respects:

"(1) By allowing Edward F. Dunn, an airman in the United States Air Force stationed at Maxwell Air Force Base, Alabama, who was in an emotionally and mentally disturbed state of being, which condition was known to the agents of the United States at Maxwell Air Force Base, to obtain a .45 caliber automatic pistol that was used by Airman Dunn to kill Shirley Underwood Dunn; and

"(2) By allowing Edward F. Dunn, known by the agents of the United States to be in an emotionally and mentally disturbed state, to return to duty, the performance of which gave him access to a dangerous instrumentality, to-wit, a .45 caliber automatic pistol."

The United States denied that it owed any duty to Mrs. Dunn or that it was guilty of any breach of a duty that may have existed. It further denied that there was any causal connection between a duty and its breach and the death of Mrs. Dunn at the hands of her former husband. In addition the United States said, affirmatively, that the return of Airman Dunn to duty by the medical staff at Maxwell Field, the performance of which duty gave him access to a .45 caliber automatic pistol, was a discretionary function on the part of said medical officers of the United States Air Force and, for that reason, falls within the exception of the Federal Tort Claims Act as set out in Title 28, § 2680(a), U.S.C.A.

After trial, the district court entered its opinion and rendered its decision in favor of the defendant United States. The court ruled that the decision of the medical officers to return Dunn to duty was not a discretionary function within the meaning of Title 28, § 2680(a), U.S.C.A., but that there was no negligence on the part of the medical officers in releasing Dunn to active duty, and no causal connection between his release and the subsequent killing. The court further ruled that "although Airman Dunn did not follow the standard Air Force procedure for drawing his weapon, no liability can be predicated on the theory that he obtained a weapon belonging to the United States (which he later used to kill Shirley Underwood Dunn) for the reason that it was not reasonably foreseeable that he would use this weapon, or any weapon, as a means of killing Shirley Underwood Dunn."

There was no conflict in the evidence. Indeed, upon the trial, the defendant offered no evidence other than its cross-examination of the plaintiff's witnesses. All of the witnesses and the exhibits were introduced by the plaintiff. Since the decision turns on the facts, it is necessary to review the evidence at some length.

The Dunns were married on October 1, 1955 and separated on July 7, 1962. At that time they had three children aged 6, 4 and 2. Mrs. Dunn secured a decree of divorce on July 31, 1962.

Their marital difficulties and the future of the children of the marriage caused Airman Dunn to become nervous, depressed and emotionally upset. He sought advice from a friend who had

come from the same part of Alabama that Dunn came from, Sergeant Harold E. Thomas, the noncommissioned Officer in Charge of Security and Law Enforcement in the Air University at Maxwell Field. Sergeant Thomas, in turn, carried him to Lieutenant Colonel Bob W. Endicott, who had been Director of Security and Law Enforcement since 1959, and who recommended that Dunn obtain a reputable attorney.

On the night of July 24, 1962, Mrs. Dunn swore out a warrant before the Sergeant of Police of the City of Montgomery charging Airman Dunn with having committed an assault and battery upon her. Later her attorney had the case "nol-prossed." In the interim her attorney had had two conversations with a First Lieutenant who was Deputy Staff Judge Advocate at Maxwell Field. He told the Lieutenant that Dunn was harassing his wife, had threatened her, and that according to Mrs. Dunn he had attacked her with a crow bar. The attorney asked if anything could be done, such as confining or restricting Airman Dunn or ordering him "to stop it." The Lieutenant replied that the only thing the Air Force could do was to counsel Dunn, and that that would be done. In a later telephonic conversation the Lieutenant told the attorney that he had telephoned Dunn's Commanding Officer, "and that Dunn's Commanding Officer had counseled him in no uncertain terms about leaving Shirley Dunn alone."

On July 26, the day after his arrest, Dunn again went to see Sergeant Thomas, who, in turn, carried him to Colonel Endicott. The Colonel asked Dunn if he had committed this assault and Dunn replied, "that he had not touched the individual at all, that he only went home after a couple of drinks and laid down."

When Colonel Endicott arrived in his office at seven o'clock on the morning of August 8, 1962, Sergeant Thomas had again brought Airman Dunn in to see him. Sergeant Thomas testified that in his opinion on that occasion Dunn was irrational, appeared very nervous, upset, depressed, and was crying. Colonel En-

dicott testifed that the following would be a fair statement of Dunn's condition at that time:

"He was under great emotional strain, that he was terrifically upset, in fact he was practically on the edge of a nervous breakdown, he was unable to control himself, he appeared as if he had not had any sleep for two or three nights, and he was crying part of the time, and he was worrying about his children * * *."

Colonel Endicott felt that Dunn's condition required that he be hospitalized, and instructed Sergeant Thomas "to take him over to the hospital so he could be admitted." Sergeant Thomas took him to the hospital emergency admittance and was directed to the psychiatric clinic, where he turned Dunn over to the noncommissioned Officer in Charge of the clinic, Sergeant Gerald Grover.

Sergeant Grover testified that Dunn was in a state of acute anxiety, somewhat depressed, and off and on he would break down and cry. The admitting physician, Dr. Friedman, told Sergeant Grover that it might be of value in making an evaluation of Dunn's condition to talk to Mrs. Dunn and asked him to get in touch with her. Sergeant Grover followed those instructions and asked Mrs. Dunn to come to Maxwell Field to talk with him. He was not certain of the date, but thought it was "probably a day or so after admission" that Mrs. Dunn came out to Maxwell Field and talked with him. She told Sergeant Grover that Dunn had previously committed assaults upon her, that she had been hit, that he had tried to attack her with a crow bar, and that he had threatened her. Sergeant Grover testified that "the primary idea she conveyed to me at that time was that she was afraid and fearful for her welfare, and the second point that she brought out was that * * * he had been annoying her by following her, driving around in the car behind her, this type of behavior. * * * She appeared to be realistically frightened." Mrs. Dunn's conversation, together with what he had seen of Dunn,

made Sergeant Grover feel that Dunn "had the potential of possibly inflicting harm on someone, himself or her." Sergeant Grover communicated this feeling to Dr. Friedman, and told Dr. Friedman in essence what Mrs. Dunn had told him. Dr. Friedman told him not to make a written note of this, "that he would convey this information to the physician who would be picking up the case, since Dr. Friedman was leaving the area shortly."

On August 10, 1962, two days after Dunn was hospitalized, another psychiatrist, Dr. Edwin Arthur Larson first met him. Dr. Friedman was in the process of being transferred away from Maxwell Air Force Base and turned the patient Dunn over to Dr. Larson for care, together with his notes and the hospital records on his case. However, Dr. Larson was not informed of Mrs. Dunn's conversation with Sergeant Grover or of any threats on her life until after the deed had been committed. Dr. Larson testified that psychiatrists attempt to ascertain what relationships with others may have been significant, "what has taken place in the lives of these persons and in their contacts with the patient which may have had effect upon his emotional and psychological state." Dr. Larson declined to say in retrospect what his action would have been, or what the result of taking into consideration any alleged threats would have been, other than he would certainly have questioned Dunn.

Dr. Larson thought that Dunn was mentally ill at the time of his admission to the hospital, and that was also Dr. Friedman's opinion. There was, of course, some difficulty in defining "mental illness." The medication administered to Dunn was a tranquillizer, Thorazine, 250 milligrams on the day of admission. The next day his medication was reduced to twenty-five milligrams four times a day, and was discontinued on August 15 when Dunn was discharged from the hospital with the following diagnosis: "Maladjustment, situational, acute, moderate, improved, manifested by anxiety, depression. Stress: 3274

Moderate, separation from wife and children. Predisposition: Unknown." Dr. Larson explained the term "Predisposition: Unknown" as follows : "The word, 'Predisposition,' is a—a standard— well, Air Force diagnoses have a standard way of—of indicating the—the various factors involved in the illness. One is how predisposed a person is to becoming mentally ill." Dr. Larson saw Dunn again on August 20 at which time he would not say that he was a "normal airman," but "was getting better from an illness," meaning the doctors' definition of illness, "the broad sense of illness." As to Dunn's mental condition on September 4, 1962, Dr. Larson testified:

"I arrived at a—an opinion as to what his mental state was on September 4 by evaluating him at a later date, on 20 November '62. From that evaluation, along then with psychological tests given to him by Dr. Hamby, at a later date, it was, in my best opinion, that Airman Dunn rather suddenly—suddenly meaning within a day prior to that —had become in a state of mind where he was unable to, though probably knowing right from wrong, was unable to adhere to the right."

As has been stated, it was on August 15 that Dunn was released from the hospital and returned to duty under the status of an outpatient. In his return to duty, Dr. Larson said nothing about any restrictions, and Colonel Endicott did not put any restrictions on him, but did change his work and assign him to the confinement section where firearms are not used. Even in that section, however, Airman Dunn could draw a weapon in line of duty.

In response to a request in interrogatories for a complete and detailed description of the procedure Dunn observed in obtaining the pistol which he used in shooting his former wife, the defendant answered:

"Airman Dunn stated that he walked behind the Air Police desk and got a 45 automatic pistol and magazine

with bullets from the weapons cabinet. Dunn stated he thought he mentioned to someone that he was going after a prisoner."

Colonel Endicott identified the Regulation for the "Authorization and Use of Weapons" by Air Force personnel, which provides in part that, "A serious responsibility is levied on persons chosen to carry and use weapons. * * * Each person's use of weapons is subject to critical review. * * * Individuals will return firearms to a control point when they complete the duties requiring them to be armed." Colonel Endicott also identified the official instructions in effect on September 4, 1962, applicable to all persons on Air Police at Maxwell Field, which provided in part:

> "Ammunition and weapons will be checked out from the weapons room for official use only. Guard personnel will check out ammunition and weapons at the direction of the immediate supervisor for use in guarding prisoners, or prisoner personnel. Ammunition and weapons will not be withdrawn from the weapons room any other time unless directed to do so by competent authority."

Colonel Endicott testified that Airman Dunn did not follow the applicable procedures in drawing a firearm on September 4, 1962, and that he had two investigations conducted "concerning how it happened that he obtained a firearm without following the procedures." He further testified:

"Q. Will you state to the court the results of your investigation in that regard?

"A. Both investigations showed that Airman Dunn reported to the Desk Sergeant during quite a bit of confusion that morning.

"Q. Sir?

"A. During quite a bit of confusion that morning; the reason there was confusion, because one of our senior colonels was found dead in his quarters—

"Q. Yes, sir.

"A. —and that was—was also being investigated, and part of the Air Police force was up there—

"Q. Yes, sir.

"A. —trying to determine whether there was foul means or natural.

"Q. And you were there, too, were you not, sir?

"A. I was there, too; that's right, sir; and when Airman Dunn came to the Desk Sergeant, he walked around behind the desk to the weapons cabinet, got a weapon and a clip, and made some remark to the boy who was Acting Desk Sergeant he had to pick up a prisoner."

Sergeant Joseph Miller Finley was Corrections Supervisor for the guard house at Maxwell Air Force Base, and was supervisor of the section to which Dunn was assigned upon his release from the hospital. Sergeant Finley testified that Air policemen in his section ordinarily do not carry firearms. He knew that Dunn was nervous, "which he had been ever since I had known him * * *. I would say that after he came back from the hospital he was more nervous." Sergeant Finley had heard that Dunn was under the care of Dr. Larson, a psychiatrist. He had heard rumors of Dunn's having threatened his wife, and that he had been accused by her of assault and battery. Sergeant Finley observed Dunn on September 4 when Dunn received a telephone call after which, according to Sergeant Finley, he turned "white as a sheet," "something that shook him up," Dunn was nervous or upset, "got a jolt or something, I don't think he was normal." On that date, Sergeant Finley was Dunn's immediate supervisor at whose direction, under the official instructions, Airman Dunn could be permitted to draw a firearm. Sergeant Finley testified that he did not give any such direction or permission, nor did anyone in his presence.

Negligence.

### 1. Return of Airman Dunn to Duty without Restriction.

Insofar as Dr. Larson is concerned, we agree with the district court that the evidence does not show any negligence on his part in returning Airman Dunn to duty without recommending any restriction. To aid him in reaching that decision, however, Dr. Larson was not furnished with an adequate history of his patient's illness. Under Sergeant Grover's testimony, coupled with that of Dr. Larson, Dr. Friedman was negligent in failing to transmit to Dr. Larson the information which Sergeant Grover obtained from Mrs. Dunn, and Sergeant Grover's feeling that Dunn might inflict harm on himself or on Mrs. Dunn. Sergeant Grover's experience in psychiatric work extended back for more than twelve years. His views resulting from his firsthand contacts and interviews with Airman Dunn and with Mrs. Dunn, and Mrs. Dunn's charges that Dunn assaulted and hit her, attacked her with a crow bar, and her fright which appeared "realistic" to Sergeant Grover would have caused Dr. Larson to question Airman Dunn more thoroughly. What further result there would have been could not be proved. Certainly, it cannot be assumed that if Dr. Larson had been furnished with this information he would have returned Airman Dunn to a duty which gave him access to firearms, without recommending any restriction. Even in the absence of such a recommendation, Airman Dunn's commanding officer changed his work and assigned him to the confinement section, where he would not ordinarily bear arms. Discharging Dunn from the psychiatric clinic and returning him to duty without recommending any restriction was negligent because that action was taken without consideration of an adequate history of Dunn's illness.

The negligence of Dr. Friedman in not transmitting that history to Dr. Larson is much further removed from a discretionary function within the meaning of Title 28, § 2680(a), U.S.C.A. than was the negligence involved in Fair v. United States, 5 Cir. 1956, 234 F.2d 288. We, therefore, decline the Government's invitation to reexamine the holding in Fair.

### 2. Permitting Airman Dunn to Draw Pistol and Ammunition.

Under the Regulation and instructions in force at the time, it is admitted that Dunn should not have been permitted to draw the .45 caliber automatic pistol and ammunition without the direction and authority of his supervisor, Sergeant Finley. Sergeant Finley had just witnessed Dunn's obvious jolt from the telephone conversation. He would have been guilty of gross negligence if he had given direction or authority for Dunn to draw a pistol and ammunition not required in Dunn's line of duty. Actually, Sergeant Finley gave no such direction or authority. The precaution adopted by Dunn's commanding officer in changing his work, and the absence of the crucial direction and authority from Sergeant Finley were all ignored by the Desk Sergeant when he failed to prevent Airman Dunn from withdrawing the pistol and ammunition with which he shot and killed his former wife. Colonel Endicott explained this conduct by the confusion resulting from having found a senior colonel dead in his quarters and the investigation which followed. No one could claim, however, that such explanation was any justification of excuse for the violation of the Regulation and instructions.

The United States argues that the Regulation and instructions were "designed for the protection of the United States against theft or loss of ordnance." We do not agree. The Regulation states that, "Precautionary measures are needed to minimize accidents." One of the instructions having to do with "Firearms and Ammunition" expresses a purpose, "To prevent serious injury to himself or to another person." It stretches the credible to say that at least one reason for maintaining tight control of firearms and ammunition was not the maintenance of safety. Clearly, we think, the precau-

tionary measures were intended to minimize accidents and to prevent injury to persons; they were for the benefit of the public, including Mrs. Dunn. See Lindsey v. Barton, 1954, 260 Ala. 419, 70 So.2d 633, 635.

The law of Alabama imposes upon persons having custody of firearms or other dangerous agencies a high degree of care to the end that third persons should not be injured through those agencies. American Railway Express Co. v. Tait, Ala.1924, 100 So. 328; Loreno v. Ross, Ala.1931, 133 So. 251. The law generally as to the handling of firearms requires reasonable or ordinary care, or a degree of care commensurate with the danger. 94 C.J.S. Weapons § 28a. We think that it was in recognition of some such duty that the precautionary measures were adopted by the Air Force. We need not decide to what extent, if any, the state law is applicable. The precautions to be exercised in permitting the withdrawal of firearms and ammunition are so fully prescribed by the Regulation and instructions that it is not necessary to resort to state law. That law is, however, pertinent to meet the test of the Act, which imposes on the United States liability relating to tort claims "in the same manner and to the same extent as a private individual under like circumstances." Sec. 2674 of Title 28, U.S.C.A.

Proximate Cause.

In United States v. Shively, 5 Cir. 1965, 345 F.2d 294, this Court held that the negligent issuance of a .45 caliber pistol by Army personnel to an off-duty sergeant in civilian clothes in violation of regulations was not the proximate cause of injury to the sergeant's recently divorced wife, whom the sergeant shot twice with the pistol before ending his own life. The Court stated that " * * * there is no ordinary reason to anticipate that, possessing such an instrument, a person of mature age, even with known financial and marital problems, will use it to commit a murderous assault upon his former wife." In that case there was no history of mental illness. What may be reasonably anticipated from "a person

of mature age" and from a person recently hospitalized for mental illness and not yet fully recovered may differ radically. An equally important distinction between the *Shively* case and this case is the difference between the applicable laws of Georgia and of Alabama. In the *Shively* case the Court said:

" * * * we conclude that the Georgia rule most clearly applicable here was stated in Andrews & Company v. Kinsel, 114 Ga. 390, 40 S.E. 300, as follows:

" 'where there has intervened between the defendant's negligent act and the injury an independent illegal act of a third person, producing the injury, and without which it would not have happened, the latter is properly held the proximate cause of the injury * * *.' "

On the other hand, in Alabama recovery was permitted for the wrongful death of a minor child held to have proximately resulted from the negligence of life insurers in issuing policies on the life of the child to an aunt who had no insurable interest and who murdered the child. Liberty National Life Insurance Co. et al. v. Weldon, Ala.1957, 267 Ala. 171, 100 So.2d 696, 697, 710, 61 A.L.R.2d 1346. The Alabama Supreme Court adopted the rule as stated in section 448 of the Restatement of the Law of Torts and held that " * * * intervening criminal acts may be found to be foreseeable and, if so found, actionable negligence may be predicated thereon." Accord, Wanca v. Penn Industries, Inc., 2 Cir., 260 F.2d 350. See also, Wildwood Mink Ranch v. United States, D.Minn. 1963, 218 F.Supp. 67.

Under the circumstances of the present case, we are left in no doubt that negligently releasing Dunn to duty which gave him access to weapons, and negligently permitting Dunn to draw the .45 caliber pistol and ammunition with which he shot and killed his former wife were proximately connected with Mrs. Dunn's death.

This Court in the *Shively* case, supra, though basing its decision on the absence of a proximate causal connection, further stated:

"From what has already been noted of the facts of this case we also conclude that appellee's claim here is a 'claim arising out of assault', which is, in those words, specifically excepted from recovery under the Federal Tort Claims Act, 28 U.S.C. § 2680(h). It is not necessary to the ruling here, and we do not determine whether every assault intervening between a shown negligence of the United States and injury to third parties is barred under the Federal Tort Claims Act by this exclusionary language." (345 F.2d at 297.)

■ That statement was not necessary to the decision in *Shively*. The United States in the present case did not rely on the exception of a "claim arising out of assault" embodied in 28 U.S.C.A. § 2680(h). In our opinion, no such contention can validly be made on remand. As said in the case of Muniz v. United States, 2 Cir. 1962, 305 F.2d 285, 286:

"Nor does this case fall within the exemption of 28 U.S.C. § 2680 (h), barring claims 'arising out of assault.' That exception applies only to assaults by government agents, not to assaults by third parties which the government negligently fails to prevent. Panella v. United States, 216 F.2d 622 (2d Cir. 1954)."

The Second Circuit's decision in Muniz was affirmed in United States v. Muniz, 1963, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805. The opinion in the *Panella* case relied on in *Muniz* was written by Circuit Judge Harlan, now a Justice of the Supreme Court. In that case, an inmate at the Public Service Hospital in Lexington, Kentucky, was allegedly assaulted by another inmate. He sued the United States under the Federal Tort Claims Act to recover damages for his injuries, claiming that the assault was caused by the negligence of employees of the United States in failing to provide adequate guards and otherwise properly supervise those confined in the institution. Judge Harlan, in an extremely thorough opinion concurred in by Judges Chase and Medina, held that the complaint stated a claim showing the pleader entitled to relief.

Damages.

■ Appellant requests that we restate the measure of damages, but there is no need for this. The learned trial court understands that the damages to be awarded are actual or compensatory, measured by the pecuniary injuries to the three minor children resulting from their mother's death. Section 2674 of Title 28, U.S.C.A. construed in Hoyt v. United States, 5 Cir. 1961, 286 F.2d 356. The same act which removed their mother also deprived the children of their father.[1]

We do express our opinion that the district court erred in excluding the bill for Mrs. Dunn's funeral expenses on the ground that no claim had been filed against the estate and the time for filing claims had expired (R. 160). Claims for funeral expenses of the decedent are not barred by the Alabama statute of nonclaims. Canada v. Canada, 1942, 343 Ala. 109, 8 So.2d 846, 848; Foster v. Foster, 1929, 219 Ala. 70, 121 So. 80, 82; Roche Undertaking Co. v. DeBardelaben, 1912, 7 Ala.App. 232, 60 So. 1000, 1001.

The judgment is reversed and the cause remanded for further proceedings consistent with this opinion.

Reversed and remanded.

---

1. On Dunn's prosecution for murder, he pleaded not guilty by reason of insanity. He was convicted of murder in the first degree and sentenced to life imprisonment. That conviction was reversed. Dunn v. State, 1964, 277 Ala. 39, 166 So. 2d 878. On the second trial, Dunn was convicted of murder in the second degree and sentenced to imprisonment for a term of twelve years.