**Meghan Corinne JABLONSKI, a minor, by her Guardian ad Litem, Isobel C. PAHLS, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 81–5786.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 6, 1982.

June 14, 1983.

As Amended Aug. 8, 1983.

William D. Keller, Hahn, Cazier & Leff, Los Angeles, Cal., for plaintiff-appellee.

James Stotter II, Asst. U.S. Atty., Los Angeles, Cal., for defendant-appellee.

Before WRIGHT, WALLACE, and KENNEDY, Circuit Judges.

WALLACE, Circuit Judge:

Meghan Jablonski (Meghan), a minor, brought suit under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) & 2671–80 (the Act), for the wrongful death of her mother, Melinda Kimball. Kimball was murdered by the man she was living with, Phillip Jablonski. Meghan charged that psychiatrists at the Loma Linda Veterans Administration Hospital (the hospital) committed malpractice proximately resulting in her mother's death. The case was tried before the district judge who decided in favor of Meghan.

On appeal, the government first claims that Meghan's suit is barred by subsection 2680(h) of the Act because the suit arose out of an assault and battery. 28 U.S.C. § 2680(h). Second, it argues that the suit is barred under subsection 2680(a) of the Act because the claims arose out of the performance by federal employees of discre-

tionary functions. *Id.* § 2680(a). Finally, the government contends that, under California law, no duty was owed to Meghan, that Kimball was not a foreseeable victim of Jablonski's violent tendencies, and that the alleged negligence was not the proximate cause of Kimball's death. We reject all of the government's contentions and affirm the judgment of the district court.

## I

On July 7, 1978, Jablonski threatened Isobel Pahls, Kimball's mother, with a sharp object and apparently attempted to rape her. Pahls had also been the object of obscene telephone calls and other malicious acts which the police believed had been committed by Jablonski. Although Pahls did not file formal charges against Jablonski, she discussed with the police the possibility of his receiving psychiatric treatment. Shortly thereafter, Jablonski volunteered to undergo a psychiatric examination at the hospital.

The police immediately called the hospital and were informed that Jablonski would be treated by Dr. Kopiloff. Because Kopiloff was unable to come to the telephone, the policeman spoke instead with Dr. Berman, the head of psychiatric services. The policeman advised Berman of Jablonski's prior criminal record, the recent history of obscene telephone calls and malicious damage, and stated that, in his opinion, Jablonski needed to be treated on an in-patient basis. Although Berman stated that he would transmit this information to Kopiloff, he failed to do so. Kopiloff testified that had he received this information from the police, he would have involuntarily hospitalized Jablonski if possible.

On Monday, July 10, Kimball drove Jablonski to the hospital. In the interview with Jablonski and Kimball, Kopiloff learned that Jablonski had served a five year prison term for raping his wife, and that four days earlier he had attempted to rape Pahls. Jablonski informed Kopiloff that he had undergone psychiatric treatment previously, but refused to state where he had received the treatment. Kopiloff concluded that the patient was vague, noncommunicative and unwilling to share his prior medical history. He diagnosed Jablonski as an "anti-social personality" and "potentially dangerous." He recommended that Jablonski voluntarily hospitalize himself, but Jablonski refused. Kopiloff concluded that there was no emergency and that there was no basis for involuntary hospitalization. Jablonski was to return in two weeks.

In a private conference following the diagnostic interview, Kimball told Kopiloff that she felt insecure around Jablonski and was concerned about his unusual behavior. Kopiloff recommended that she leave Jablonski at least while he was being evaluated. When Kimball responded "I love him," Kopiloff did not warn her further because he believed she would not listen to him.

No attempt was made to locate Jablonski's prior medical records. Meghan's retained expert witness, Dr. Thompson, testified that under professional standards commonly practiced in the community, Kopiloff should have recognized that Jablonski was potentially very dangerous. He further testified that given the potential danger and the patient's reluctance to reveal his past medical treatment, Kopiloff should have obtained Jablonski's prior medical history at the veterans facilities in the Los Angeles and Long Beach area. He stated that these records could have been obtained by telephone without Jablonski's consent.

The hospital records of Jablonski's prior treatment revealed that in 1968 he had received extensive care at an Army hospital in El Paso. The El Paso records reported that Jablonski had a "homicidal ideation toward his wife," that on numerous occasions he had tried to kill her, that he "had probably suffered a psychotic break and the possibility of future violent behavior was a distinct probability," and that he was "demonstrating some masculine identification in beating his wife as his father did frequently to his mother." The final diagnosis concluded in part that Jablonski had a "schizophrenic reaction, undifferentiated type,

chronic, moderate; manifested by homicidal behavior toward his wife."

On Tuesday or Wednesday, July 11 or 12, Pahls telephoned Kopiloff and complained because Jablonski was not to return for two weeks. Kopiloff persuaded her not to call the police and agreed to see Jablonski on Friday, July 14. On Wednesday, July 12, Kimball and Meghan moved out of Jablonski's apartment and into Pahl's apartment because of warnings Kimball had received earlier that day from her priest. Kimball continued to see Jablonski, however, and drove him to the hospital for his second appointment.

On July 14, Jablonski met with both Kopiloff and Dr. Hazle, Kopiloff's supervisor. Although Jablonski volunteered that he had had frequent problems all his life with violent reactions, he was again vague as to his prior treatment and again refused a request to admit himself as an in-patient. Kopiloff concluded that Jablonski possessed an "antisocial personality with explosive features." Although Hazle believed that Jablonski was dangerous and that his case was an "emergency," both doctors concluded that there was no basis for involuntary hospitalization. Again, no effort was made to seek the prior medical records. Instead, Jablonski was scheduled for more tests and given a prescription for valium.

During Jablonski's appointment with Hazle and Kopiloff, Kimball stood in the hallway outside. Noticing that she seemed to be in distress, a third doctor, Dr. Warnell, chief of the Mental Health Clinic, invited her into his office. Kimball expressed fear for her personal safety. Warnell replied that "if she was afraid of her husband and that he didn't fit the criteria to be held in the hospital, that she could consider staying away from him." Although Warnell later relayed this information to Kopiloff and Hazle, they concluded that Jablonski was not homicidal or suicidal, and that he could not be involuntarily hospitalized. Another appointment was made for Jablonski for Monday, July 17.

On Sunday, July 16, Kimball went to Jablonski's apartment, apparently to pick up some baby diapers. Jablonski either was at the apartment at the time or arrived soon after. He then attacked and murdered her.

The district judge found that Meghan had proven several claims of malpractice against the hospital psychiatrists. The district judge's findings of malpractice for failure to record and transmit the information from the police, for failure to obtain the past medical records, and for failure adequately to warn Kimball, each of which the district court found proximately caused Kimball's death, are significant for purposes of our disposition.

## II

The United States may not be sued except when it waives its sovereign immunity. Although the government generally has waived its immunity from tort claims in the Act, this waiver is limited by several exceptions. 28 U.S.C. § 2680. The government contends that Meghan's suit is barred by two of these exceptions. *Id.* § 2680(a), (h).

### A.

The government argues first that it is immune from Meghan's suit because the claim "arises out of an assault and battery," and thus is excluded by subsection 2680(h). Subsection 2680(h) states in relevant part that the Act, as well as the jurisdiction based on it, does not apply to "[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights . . . ."

Meghan responds that the government failed to include the subsection 2680(h) defense in the pretrial conference order, and that it cannot raise the defense for the first time on appeal. Ordinarily, the pretrial conference order takes the place of the pleadings, and a failure to include a defense in the order precludes the defendant from raising it on appeal. Fed.R.Civ.P. 16; *see Donovan v. Crisostomo,* 689 F.2d 869, 875 (9th Cir.1982). We have stated

previously, however, that if a claim falls within one of the section 2680 exceptions, the district court lacks subject matter jurisdiction. *Morris v. United States,* 521 F.2d 872, 874 (9th Cir.1975); *see also Nevin v. United States,* 696 F.2d 1229, 1231 (9th Cir. 1983). Since we are required to notice a lack of jurisdiction whether or not it is raised by the parties, *see Mansfield, Coldwater & Lake Michigan Railway v. Swan,* 111 U.S. 379, 4 S.Ct. 510, 28 L.Ed. 462 (1884); Fed.R.Civ.P. 12(h)(3), we must address the merits of the government's subsection 2680(h) defense regardless of whether it is listed as an issue in the pretrial order.

■ Under subsection 2680(h) the government retains its immunity from claims arising from assaults and batteries committed by government employees. The question presented here is whether subsection 2680(h) is intended to prohibit a suit for injuries resulting from an attack by a nongovernmental employee, when the attack was alleged to have been proximately caused by the negligence of government employees. Although we have never faced this question, all circuits passing on the issue have held that the assault and battery exception does not bar such suits. *See Gibson v. United States,* 457 F.2d 1391, 1395–97 (3d Cir.1972); *Rogers v. United States,* 397 F.2d 12, 15 (4th Cir.1968); *Underwood v. United States,* 356 F.2d 92, 99–100 (5th Cir.1966) (*Underwood*); *Panella v. United States,* 216 F.2d 622, 624 (2d Cir.1954); *accord Cline v. Herman,* 601 F.2d 374, 375 (8th Cir.1979) (per curiam).

The only case cited to us which appears to arrive at a contrary conclusion is *United States v. Shively,* 345 F.2d 294, 297 (5th Cir.), *cert. denied,* 382 U.S. 883, 86 S.Ct. 177, 15 L.Ed.2d 124 (1965) (*Shively*). In *Shively,* the Fifth Circuit stated in dicta that subsection 2680(h) would apply to an attack by a military officer against his wife, even though the wife's suit was based on negligence. *Shively* does not persuade us, nor apparently did it ultimately persuade the Fifth Circuit as it subsequently disapproved

of this dicta. *Underwood, supra,* 356 F.2d at 100.

■ The government attempts to distinguish the decisions holding that the assault and battery exception does not bar suits for negligence. It asserts that each of these cases concerned a plaintiff who was committed to the custody of the government, either as a prisoner or a patient. This distinction is not meaningful. It is more significant that these cases, like the one before us, are based on negligence, not on assault and battery. Moreover, it seems likely that the policy underlying subsection 2680(h) was to insulate the government from liability for acts it was powerless to prevent or which would make defense of a lawsuit unusually difficult. *See Panella v. United States, supra,* 216 F.2d at 625–26. Meghan's suit is based on the negligence of government employees that could have been prevented by an exercise of due care. We hold that Meghan's suit is not precluded by subsection 2680(h).

### B.

The government argues next that Meghan's suit is barred by 28 U.S.C. § 2680(a). That subsection exempts from the waiver of immunity any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." The district judge's relevant findings of malpractice are that the government doctors failed to record and communicate the police warning, to obtain medical records, and to warn Kimball. The question posed is whether these acts or omissions relate to "discretionary functions" within the meaning of subsection 2680(a).

■ Our determination of whether or not a governmental employee's function is discretionary requires us to determine whether the act or omission occurred at the planning level or at the operational level. *Lindgren v. United States,* 665 F.2d 978, 980 (9th Cir.1982); *Thompson v. United States,* 592 F.2d 1104, 1111 (9th Cir.1979); *Driscoll*

*v. United States,* 525 F.2d 136, 138 (9th Cir.1975). The general rule is that discretionary functions are ones which involve policy choices. *Lindgren v. United States, supra,* 665 F.2d at 980. As we elaborated in *Thompson v. United States, supra:*

> Obviously, attending to many day-to-day details of management involves decisions and thus some element of discretion. The exercise of this kind of discretion does not fall within the discretionary function exemption. The distinction generally made in the application of the discretionary function exemption is between those decisions which are made on a policy or planning level, as opposed to those made on an operational level.'

592 F.2d at 1111.

We have never examined the discretionary function exception in a case involving the government's care of a mental health patient. Two other circuit courts, however, have faced very similar situations, and in both cases have found that the discretionary function exemption did not apply. In *White v. United States,* 317 F.2d 13 (4th Cir.1963), a veteran at a government hospital allegedly committed suicide. Suit was brought for wrongful death, alleging that the hospital had been negligent by allowing him to roam freely rather than confining him more closely. Plaintiff claimed that the decedent's medical files contained a history of suicidal tendencies, and that if the doctors had consulted those files, they would have restricted the deceased's movement to a much greater extent. *Id.* at 15–16. In rejecting the government's subsection 2680(a) defense, the court held that although the hospital's policy of allowing patients the maximum freedom warranted by each patient's condition was a discretionary decision, the application of that policy to an individual case was an administrative decision at the operational level. Hence, the government was not exempt under subsection 2680(a). *Id.* at 17.

In *Underwood, supra,* a member of the Air Force who had received care at the base psychiatric clinic, shot and killed his former wife. In a subsequent suit for damages, plaintiff claimed that the United States was negligent in allowing the patient to obtain a gun, arguing that the patient's return to duty should have been subject to the restriction that he not be allowed to receive weapons. 356 F.2d at 94. As in *White v. United States, supra,* the essence of the complaint was that the doctors had been negligent in making a decision based on incomplete knowledge of the complete facts pertaining to the patient. The decedent had informed military personnel that her husband had threatened her, and this information was provided to one of the doctors treating the patient. However, a second doctor, who assumed responsibility for the patient, and who ultimately ordered his release, was never apprised of the threats. The court held that in negligently failing to transmit the patient's history, the former doctor was not exercising a discretionary function. *Id.* at 98; *see also Fair v. United States,* 234 F.2d 288 (5th Cir.1956).

The government relies upon *Smart v. United States,* 207 F.2d 841 (10th Cir.1953) (*Smart*), in which the Tenth Circuit held that a suit alleging injury resulting from the negligent release of a mental patient from a government hospital was barred by the discretionary function exemption. In that case, a veteran was released from the mental hospital for a trial visit to his home. On the way home, he stole an automobile and, while driving recklessly, injured the plaintiff. The court held that the decision to release the veteran for a trial visit involved an exercise of discretion. *Id.* at 842–43.

■ We are persuaded that *White v. United States* and *Underwood* correctly state the law. To the extent that *Smart* is in conflict, we disapprove of its holding. The acts and omissions of the doctors in the present case were operational acts, not discretionary acts involving planning. No general policy regarding veteran medical records prevented the doctors in this case from obtaining Jablonski's records. Nothing prevented them from recording and communicating the information relayed by

the police. Providing a warning is a day-to-day hospital activity.

Moreover, policy considerations warrant the conclusion that these acts or omissions were not discretionary. In *Driscoll v. United States, supra,* 525 F.2d at 138, we cited a list of factors to be considered in distinguishing decisions made at the planning level from those made at the operational level. These include "the character and severity of the plaintiff's injury, the existence of alternative remedies, the capacity of a court to evaluate the propriety of the official's action, and the effect of liability on the effective administration of the function in question." *Id., citing* Jaffe, *Suits Against Governments and Officers: Damage Actions,* 77 Harv.L.Rev. 209, 219 (1963). The application of these factors to the case before us supports our conclusion. The injury obviously was severe, and there are no meaningful alternative remedies available to plaintiff. Courts should encounter no difficulty in evaluating the official's action, since they are experienced in deciding medical malpractice cases. Finally, there is no evidence that our decision will affect the effective administration of veterans hospitals. Requiring doctors to obtain, communicate, and use relevant information on dangerous patients will not burden the hospitals financially. Furthermore, the doctors will be held only to standards of adequate medical care in their community. Therefore, we find that Meghan's suit is not barred by subsection 2680(a).

### III

We now turn to the merits of the case. We apply California tort law because the alleged negligence occurred in California. *See* 28 U.S.C. § 1346(b).

■ Only the liability of the hospital is presented to us in this appeal. The district court's primary findings of malpractice concerned a failure to record and communicate the warning by the police, the failure to secure Jablonski's prior records, and the failure to warn Kimball. The district judge found each of these to be separate acts of malpractice, each one of which was a proxi-

mate cause of Kimball's death. Thus, any one of the findings, if not clearly erroneous, can support a judgment for Meghan. *Rudelson v. United States,* 602 F.2d 1326, 1329–30 (9th Cir.1979); *McCune v. F. Alioto Fish Co.,* 597 F.2d 1244, 1252 (9th Cir.1979). Moreover, we accept the district judge's interpretation of the law of the state in which he sits unless it is clearly wrong. *Camacho v. Civil Service Commission,* 666 F.2d 1257, 1262 (9th Cir.1982); *S.A. Empresa De Viacao Aerea Rio Grandense v. Boeing Co.,* 641 F.2d 746, 752 (9th Cir.1981). We conclude that the district judge's findings were not clearly erroneous and his interpretation of the applicable California law was not clearly wrong.

Meghan's failure-to-warn claim is governed by *Tarasoff v. Regents of the University of California,* 17 Cal.3d 425, 551 P.2d 334, 131 Cal.Rptr. 14 (1976) (*Tarasoff*). Meghan must show a breach of duty by proving that (1) a psychotherapist-patient relationship existed, (2) that the psychotherapist knew, or should have known, that Jablonski was dangerous, (3) that Kimball was a foreseeable victim of Jablonski's violent tendencies, and (4) that the psychotherapist did not take the necessary steps to discharge his duty. 17 Cal.3d at 439. She also must show that the hospital's negligent act proximately caused her injury. *See* 4 B. Witkin, Summary of California Law, Torts, § 488 (8th ed. 1974).

■ The government argues first that it did not owe any duty to Kimball because Jablonski was an outpatient and therefore no special relationship existed between the doctors and Jablonski. Such an interpretation is contrary to the express holding of *Tarasoff,* which stated that a special relationship exists between any psychotherapist and his patient. *Tarasoff, supra,* 17 Cal.3d at 435, 436 n. 6, 131 Cal.Rptr. 14, 551 P.2d 334. Indeed, the patient in *Tarasoff* was an outpatient. *Id.* at 430 n. 2, 432, 131 Cal. Rptr. 14, 551 P.2d 334.

■ The government argues next that no duty was owed to Kimball because she was not the foreseeable victim of Jablonski's

violence; that is, she was not sufficiently targeted as a victim of the mentally sick individual. We need not decide whether our review of a foreseeability issue is a question of fact or law, because we would arrive at the same conclusion under either standard.

Although the case before us falls somewhere between the extremes of *Tarasoff* and *Thompson v. Alameda,* 27 Cal.3d 741, 614 P.2d 728, 167 Cal.Rptr. 70 (1980), we find *Tarasoff* to be more clearly on point. Unlike the killer in *Tarasoff,* Jablonski made no specific threats concerning any specific individuals. Nevertheless, Jablonski's previous history indicated that he would likely direct his violence against Kimball. He had raped and committed other acts of violence against his wife. His psychological profile indicated that his violence was likely to be directed against women very close to him. This, in turn, was borne out by his attack on Pahls. Thus, Kimball was specifically identified or "targeted" to a much greater extent than were the neighborhood children in *Thompson.* Moreover, the difficulties in giving a warning that were present in *Thompson* are not present here. *See id.* at 755–56, 167 Cal. Rptr. 70, 614 P.2d 728. Warning Kimball would have posed no difficulty for the doctors, especially since she twice expressed her fear of Jablonski directly to them. Neither can it be said, as was the case in *Thompson,* that direct and precise warnings would have had little effect. *See id.*[1]

■ The finding that Kimball was a foreseeable victim was dependent on the district judge's finding that the doctors had been negligent in failing to obtain Jablonski's prior medical history. The government claims that this latter finding was incorrect. However, the government must show that the finding was clearly erroneous. *Rooney v. United States,* 634 F.2d 1238, 1244 (9th Cir.1980). The district judge chose to believe Thompson, Meghan's expert witness, that the failure to obtain Jablonski's records was negligent in light of accepted community standards. His finding was not clearly erroneous.

■ The government argues next that even if it owed the decedent a duty of care, that duty was properly discharged by the warnings given by Kopiloff and Warnell to Kimball. The district judge found that the warnings from both doctors, if given, were totally unspecific and inadequate under the circumstances. The district court's finding was not clearly erroneous.

Finally, the government argues that Kimball received sufficient warning from a variety of sources, including a psychological hotline, her attorney, her priest, and her mother. The government does not cite any specific language in *Tarasoff* or otherwise attempt to classify its argument under any specific legal doctrine.

The government's argument may be that Kimball was contributorily negligent in continuing to see Jablonski or that she assumed the risk that she would be harmed by Jablonski. The government did argue in the district court that Meghan's award should be reduced due to Kimball's comparative negligence, but its argument was rejected by the district judge. His finding was not clearly erroneous.

To the extent the government's argument is that the doctors' failure to warn was not the proximate cause of Meghan's loss, we conclude that the government failed to show that a finding of proximate cause was clearly erroneous. *Rudelson v.*

1. Thus, this case is distinguishable from *Vu v. Singer Co.,* 706 F.2d 1027 (9th Cir.1983), in which we held that an operator of a Job Corps center owes no duty to warn people residing in the neighborhood where the center is located of the violent tendencies of job corps members. *Vu* was clearly controlled by *Thompson v. Alameda,* 27 Cal.3d 741, 614 P.2d 728, 167 Cal.Rptr. 70 (1980), since the potential harm was not directed to a specifically indentifiable individual, but to an entire neighborhood. *See Vu, supra,* 706 F.2d at 1029. Moreover, we stated in *Vu* that the creation of such a duty would jeopardize the Job Corps program, and thus contradict California law. *Id.* at 1029–31. As we have indicated previously, imposing a duty to warn on the veterans hospital in this case will not undermine important governmental programs.

*United States, supra,* 602 F.2d at 1330. The district judge referred to the information from Jablonski's prior medical records and found that "this data properly used, would have prevented the murder in question." The judge's finding is not clearly erroneous.

The district judge also found, as separate acts of malpractice, that the doctors failed to secure Jablonski's prior records and failed to record and communicate the warning by the police. These findings were not clearly erroneous. The record adequately supports the finding that preventative action would have been taken but for these failures.

AFFIRMED.