Nora Faye **JOHNSON**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

Nos. 71–921–Civ–J–T and
71–922–Civ–J–T.

United States District Court,
M. D. Florida,
Jacksonville Division.

March 23, 1976.

Gary B. Tullis, Jacksonville, Fla., for plaintiff.

Ernst D. Mueller, Asst. U. S. Atty., Jacksonville, Fla., for defendant.

## MEMORANDUM OPINION

TJOFLAT, Circuit Judge.

These two companion suits were brought pursuant to the Federal Tort

Claims Act[1] by the widow of Jimmy Ray Johnson, a United States Army sergeant who at the time of his death in 1971 was stationed at Fort Stewart, Georgia. In both cases, plaintiff alleges that Fort Stewart's hospital staff negligently failed to provide adequate medical care to her mentally ill husband; furthermore, it is alleged that the Government was negligent in permitting Sergeant Johnson to leave the hospital and the post after a ten-day hospitalization in January 1971. According to plaintiff, this negligence was the cause of the tragic events of January 27, 1971, when Sergeant Johnson murdered his brother-in-law, wounded his wife in an attempt to kill her, and then committed suicide. Case Number 71–921–Civ–J–T seeks $1,000,000 in damages for plaintiff's own injuries; in Case Number 71–922–Civ–J–T, plaintiff claims an additional $1,000,000 in damages for her husband's wrongful death. The cases were tried to the Court, at which time extensive evidence was received in the form of exhibits and live testimony[2]. On the basis of all the evidence, the Court finds the factual background of these two cases to be as follows:

Plaintiff married Jimmy Ray Johnson on October 17, 1967, and lived with him at several military posts in this country and in Europe. In June of 1970, Sergeant Johnson was assigned to Fort Stewart, Georgia. Plaintiff and the couple's two infant children accompanied him to Fort Stewart, where the family resided in a trailer camp in Hinesville, Georgia, a town approximately four miles from the post. Soon after the Johnsons' arrival at Fort Stewart, their marital problems came to the attention of Chaplain Herbert Turner, who was

1. Title 28, U.S.C. §§ 1346(b), 2671 et seq.

2. Among the evidence received by the Court was the complete trial record in *Agnes Jacobs Johns v. United States*, Civ. No. 769 (S.D.Ga., Dec. 21, 1973), which arose out of the same incidents as the two cases presently under consideration. In that case, the widow of Carroll Johns, who was murdered by Sergeant Johnson on January 27, 1971, sued under the

Tort Claims Act to recover for the death of her husband. Liability was found after a bench trial, and judgment was entered for the plaintiff. On August 22, 1974, this Court denied plaintiff's motion for partial summary judgment, which was based upon collateral estoppel principles, and also denied motions by both parties to the effect that the record in the *Johns* case showed no issue as to any material fact regarding liability.

assigned to Sergeant Johnson's company. The conflicts between husband and wife centered mainly upon how to discipline their children; plaintiff represented to Chaplain Turner that Sergeant Johnson struck the children too severely and often without reason. Chaplain Turner felt that the situation was serious enough to justify a referral to the Mental Hygiene Clinic at Fort Stewart. The referral report indicates that Chaplain Turner took this action because Sergeant Johnson was "easily led to run away from responsibility; he frequently states that he is going to kill himself. If someone tells me how to run my family, I will kill myself. I don't want anything to do with Chaplain Turner." On August 12, 1970, plaintiff and Sergeant Johnson went to the clinic.

The Mental Hygiene Clinic was a section of the post hospital, which was housed in a refurbished barracks originally constructed for temporary use during World War II. Although the hospital did not have a separate psychiatric ward, several of its beds were set aside for mentally ill patients, including at least one bed in a private room. At the time of Sergeant Johnson's referral to the Mental Hygiene Clinic, the Clinic staff consisted of three mental hygiene specialists and one psychiatrist, Doctor Charles Merideth. During this period, no clinical psychologist was assigned to the Clinic. Dr. Merideth admitted that the facilities at Fort Stewart were not adequate to treat all types of mentally ill patients; if the patient was on active duty and had a mental disorder which the Clinic was not equipped to handle, the patient was generally sent to Fort Gordon, Georgia, which had a larger hospital with a fifteen-bed psychiatric ward[3].

When the couple arrived at the Clinic on August 12, they received separate initial interviews with two enlisted men who were serving as mental hygiene specialists. Sergeant Johnson was interviewed by Specialist Bennett Ligotti, a recent college graduate with a degree in sociology. Specialist Ligotti had taken courses in psychology at college, but his actual preparation for working directly with mentally ill patients was limited to a brief orientation course and some part-time instruction concurrent with his duties at Fort Stewart. While Specialist Ligotti was interviewing Sergeant Johnson, a co-worker, Specialist Berry, was conducting a similar interview with plaintiff. On the basis of the interviews, both specialists prepared diagnostic histories. The history taken from Sergeant Johnson by Specialist Ligotti noted the patient's unwillingness to seek medical care and recorded Sergeant Johnson's view of his marital problems. According to the sergeant, he and his wife needed no outside help with their marriage; furthermore, he complained that Chaplain Turner had sided with Mrs. Johnson on whether the sergeant was disciplining his children too severely. Sergeant Johnson also told Ligotti that if he had had a gun, he would have killed himself and the chaplain. In her interview, plaintiff commented to Specialist Berry that her husband expected too much of their children and that she feared both for them and for herself. At times, plaintiff said, her husband would slap her, and occasionally he would lapse into uncontrollable rages. Specialist Berry concluded from this that Sergeant Johnson sounded paranoid, "everybody working against him."

Later the same day, after the specialists had reported their findings to Dr. Merideth, the doctor conferred with plaintiff and her husband. Doctor Merideth's report of this conference shows that the Johnsons repeated their opposing views of child discipline and their other marital problems. Plaintiff added that her husband had threatened suicide several times, although he had never

---

**3.** See the trial transcript in *Johns v. United States, supra,* note 2, at 397–98. During his two-year tour at Fort Stewart, Dr. Merideth transferred four or five patients to the hospital at Fort Gordon, *id.,* at 398.

made any attempts. Sergeant Johnson agreed that he had had suicidal and homicidal thoughts once in the previous two months; however, he stated that he had no such thoughts at the time of the conference. The doctor observed that Johnson "had a flat affect, was circumstantial, and tangential at times. There was no depression, anxiety, or hallucinations, but there was evidence of ideas of reference."[4] Doctor Merideth's conclusions from this conference were that plaintiff exhibited no signs of psychiatric illness, but that Sergeant Johnson should be examined further for possible schizophrenia or a brain tumor. A neurological examination was ordered for Sergeant Johnson at Fort Gordon on August 27, 1970. Specialist Ligotti was assigned to be the Johnsons' primary therapist on subsequent outpatient visits to the Clinic.[5]

Sergeant and Mrs. Johnson returned to the Clinic on September 1, 1970, where they were interviewed first by Specialist Ligotti. The sergeant referred vaguely to an incident which had recently taken place in his unit; he said that the next time he was accused of having a submachine gun without authorization, he would have it and go home and use it. Ligotti informed Dr. Merideth of this statement and brought the Johnsons to

4. Dr. Merideth explained some of these terms as follows: A "flat affect" refers to a noncommittal facial expression. Circumstantiality exists when "a person goes into great detail describing the circumstances of something but never really answering the question . . . " Tangentiality means that "a person is just going from one thought to the next with no logical connection between the two . . . " Trial transcript in *Johns v. United States,* supra, note 2, at 423–24. At the trial of the cases *sub judice,* Dr. David Vernon Hicks defined "ideas of reference" as being an illogical tendency to relate external events to one's self. See Transcript of Testimony of Dr. David Vernon Hicks at 66.

5. The text of Dr. Merideth's report, prepared after the initial visit, reads as follows:

1. This 23-year old, E–5 and his 23-year old wife are referred because of marital conflicts, specifically, in dealing with the disciplining of their children. The couple was interviewed at MHCD on 12 August 1970.

2. Mrs. Johnson complains that her husband expects too much from their 22-month old and 9-month old children and that he disciplines them too severely, often spanking them and leaving bruises. She also states that he has slapped her a number of times, but has never hurt her. She reveals that she is fearful for her children and herself, because at times he goes into what she considers an uncontrollable rage. In addition, Mrs. Johnson reports that her husband has been acting as if everyone at Fort Stewart has been working against him, including several people in his unit, and even Chaplain Turner. She also indicates that her husband has threatened suicide on occasion, but has never made any attempts. She reports that he had not always been like he is now, and that she began noticing a change in him after the birth of their first child.

According to SGT Johnson, he has never been out of control of his emotions, and he spanks his children to discipline them, the way he sees fit. He complained that Chaplain Turner was prejudiced, and not very understanding. The only assistance he wants from MHCD is in getting him transferred to a unit where he can work in his MOS. As far as his wife and children are concerned, he feels that situation can be settled without any outside help, although he and his wife have consulted a civilian pastor recently.

3. Mrs. Johnson appeared well-groomed and was cooperative throughout the interview. She appeared concerned about her husband's condition but did not appear significantly anxious or depressed. SGT Johnson had a flat affect, was circumstantial, and tangential at times. There was no depression, anxiety, or hallucinations, but there was evidence of ideas of reference. His memory and intellectual functioning were fair. He was well-oriented to time and place. He indicated that once in the past two months he had suicidal and homicidal thoughts, but is not homicidal or suicidal at present.

4. Diagnosis: (a) Mrs. Johnson: No psychiatric illness.
 (b) SGT Johnson: R/O Schizophrenia R/O Brain tumor

5. It is recommended that SGT Johnson receive a complete neurological exam, including an EEG. An appointment has been made for him at the Fort Gordon neurological clinic for 27 August 1970 at 0800 hours. The couple will be followed up at MHCD by SP5 Ligotti.

see him. Sergeant Johnson announced that, if he had had a machine gun at some time during the preceding two weeks, he might have used it in the security area. Doctor Merideth also learned that the sergeant had failed to keep the previously arranged appointment for an examination at the Fort Gordon neurological clinic. When questioned about the matter, Sergeant Johnson simply stated that he would not go to Fort Gordon. The doctor observed that Johnson was more seriously ill than he had been on the previous visit. As in August, he displayed a flat affect, was circumstantial and tangential, and had ideas of reference; [6] by the time of the September appointment, he was also extremely irritable, with paranoid delusions, and was making homicidal threats. Over Sergeant Johnson's vigorous protests, Doctor Merideth ordered his immediate hospitalization. The sergeant remained in a private room at Fort Stewart for ten days. On September 1, he was placed on two milligrams of stelazine (an antipsychotic medication) three times a day; this dosage was increased until September 8, when the sergeant was receiving ten milligrams three times a day. Sergeant Johnson's progress chart during the ten-day period discloses the following: (1) September 2—the patient is agitated and markedly suspicious; (2) September 3—patient is less

overtly hostile, but he is more guarded [7] and suspicious, with ideas of reference; (3) September 4—patient better, but still psychotic; (4) September 7—patient continues to improve; (5) September 8—patient better, stelazine increased to ten milligrams three times a day; (6) September 9—with patient's rapid improvement, though he is still flat and guarded, an early discharge is planned; (7) September 10—patient doing well, will be discharged today. The discharge diagnosis was paranoid schizophrenia, a serious psychiatric disorder characterized by fixed delusions. Doctor Merideth ordered that Sergeant Johnson continue the ten-milligram dosages of stelazine, and that he receive follow-up outpatient treatment approximately every two weeks at the Mental Hygiene Clinic.[8] At the time of Sergeant Johnson's discharge from the hospital, Doctor Merideth stressed to him the importance of taking the stelazine which had been prescribed.

Sergeant Johnson appeared again at the Clinic on September 11, 1970, the day after his discharge. The sergeant complained that he was having difficulty controlling his feelings, and that he had a good deal of strength in his arms and felt that he had to do something with them. Doctor Merideth's notes from this occasion indicate that Johnson showed no signs of anger or paranoia. Concluding

---

6. For an explanation of these terms, see note 4, *supra*.

7. The word "guarded" was defined by Dr. Merideth as follows: "This is a means by which a person sort of looks at you suspiciously and keeps his mouth shut. I mean, he's guarding his—what he's relating to you." Trial transcript in *Johns v. United States, supra,* note 2, at 442.

8. Dr. Merideth's summary, prepared at the time of Sergeant Johnson's discharge from the hospital on September 10, 1970, reads:

REASON FOR REFERRAL: This 23-year old, married SGT E5, was originally evaluated at MHCD on 12 August 1970. He was hospitalized on 1 September 1970 because of the increasing delusions and threats of homicide.
PRESENT ILLNESS: At the time of the initial evaluation, the patient displayed a flat

affect, was circumstantial sometimes displaying *tangentiality and having ideas of ref*erence. He was also delusional and his intellectual functioning appeared fair to poor.

It was believed that he possibly had a brain tumor or was schizophrenic. He was hospitalized on 1 September 1970 because of increasing irritability, threats of homicide, and paranoid delusions.
REVIEW OF SYSTEMS: Negative
PHYSICAL EXAMINATION: Temperature, 100; Pulse, 88; Blood Pressure, 138/92
LABORATORY DATA: Within normal limits.
COURSE IN HOSPITAL: Improved.
FINAL DIAGNOSIS: Paranoid schizophrenia.
DISPOSITION AND RECOMMENDATION: The patient was placed on 10 milligrams, Stelazine, TID, and he will be seen at MHCD on an outpatient basis.

that Sergeant Johnson's complaints were side effects of the stelazine, the doctor prescribed four milligrams of artane twice a day to counteract these effects. Johnson returned to the Clinic on September 15, 1970, when Dr. Merideth was not there. He told the Clinic personnel that he was "feeling shaky, tense, nervous as if he were going to die," and that he had had a similar episode the previous Sunday. He then rested for half an hour at the Clinic. Upon waking, he said that he felt much better; he was allowed to leave, and promised to return the following morning. The next day, he met with both Specialist Ligotti and Dr. Merideth. He announced that his condition was improving and that the situation in his family was better.[9] At this time, Dr. Merideth prescribed valium, a mild sedative, for the sergeant. Johnson was seen again at the Clinic on October 2, 1970, and October 12, 1970. On both occasions he seemed to be doing well and was apparently benefiting from the medications. At some point in late October of 1970, it was made known to the Clinic that Sergeant Johnson had recently stopped taking his medications. Dr. Merideth was in California when the information was received, and this fact was not communicated to him when he returned to the post on or about November 9, 1970. During Dr. Merideth's absence, the Clinic was still in operation, and the emergency room at the post hospital was adequately staffed by physicians. Furthermore, Dr. Dozier, a psychiatrist at Fort Hunter, Georgia, was on call to handle patients who needed immediate psychiatric care.

Conferences with Clinic personnel continued during the month of November. At one meeting, plaintiff claimed that Sergeant Johnson had threatened to crash their car into an oncoming truck, saying that he was content to let nature take its course. During another conference, plaintiff asked Specialist Ligotti to do something with her husband because he was threatening to kill her and she was afraid of him. Ligotti informed Mrs. Johnson that, if she feared for her safety, she should leave the area. Also, at one of the November conferences, Ligotti urged Sergeant Johnson to resume taking the prescribed medications. On December 3, 1970, plaintiff called the Clinic and insisted to speak to Dr. Merideth. She told Ligotti that her husband was manageable as long as she gave in, but that he would not return to the Clinic; she also wanted some medication for her nerves. Ligotti recorded that plaintiff was "demanding, manipulative, and threatening during conversation." It was agreed that plaintiff would call for an appointment when she felt that she could make it in. Plaintiff also told Ligotti that on the previous evening Sergeant Johnson had spanked one of the children in such a manner that she felt compelled to tell a lieutenant who lived in their trailer park, as well as Johnson's company commander. However, the next day Ligotti spoke with the company commander, who reported that the sergeant was doing well. On December 8, 1970, plaintiff again called the Clinic and spoke with Ligotti; she asked him for an emergency appointment, which he refused, giving her instead a routine appointment for the following week. In the months of November and December, the couple's contacts were entirely with lower-ranking clinic staff members. Dr. Merideth did not see or speak with either Sergeant or Mrs. Johnson during this period.

Instead of keeping her appointment at Fort Stewart, plaintiff left her husband and took the children to Jacksonville, Florida, where she was voluntarily hospitalized on December 11, 1970. She was

9. The Clinic record of the September 16 visit indicates that:

He (Sergeant Johnson) indicates that his mood has been pretty good. He feels that he has improved since on that occasion (sic). He feels his interest is more intense and he can tolerate his family better and enjoy himself more. There have been no arguments recently. The primary concern of the patient is sleep and appetite. The wife, however, reported that the patient looks to her somewhat withdrawn.

admitted upon the request of her sister, who became alarmed at plaintiff's suicidal threats and her suggestions that she might kill her children. At the time of her admission, plaintiff claimed that her husband was abusing her and the children. She complained that, as long as her husband was performing well in his unit, the Army would not force him to accept medical care. Plaintiff also stated that she didn't "know what to do or how to handle her problem;" she added that she was "seriously depressed, enough to think of suicide and to contemplate it." Her physician was Dr. William Laney Whitehurst, a psychiatrist, whose initial diagnosis was of "depressive reaction, situational type." Mrs. Johnson remained in the hospital for fourteen days. Tests conducted during that time raised the possibility of several serious psychiatric problems, including suicidal thoughts or tendencies.[10] Nurses' reports show that plaintiff was aloof and often depressed; one evening, she explained to a nurse that thoughts of suicide tended to "flash through her mind" when she became so depressed. Plaintiff's husband visited her several times during her stay at the hospital. During one of these visits, with Dr. Whitehurst present, Sregeant Johnson became very abusive and threatening. Dr. Whitehurst told them that they both needed treatment, and advised Johnson to return to the Clinic at Fort Stewart. The sergeant refused, saying that he intended to go carousing and that he was going to take the children to live with him. On December 24, 1970, plaintiff was discharged from the hospital. Dr. Whitehurst's discharge diagnosis was acute paranoid reaction—situational type, together with depression. Evidence adduced at trial established that this disorder is a type of psychosis[11]; however, no anti-psychotic medication was prescribed for plaintiff to use as an outpatient. The doctor had recommended that husband and wife live apart. Therefore, plaintiff went to stay with her brother, Carroll Johns, who lived in Waynesville, Georgia.

Plaintiff next saw her husband on December 26, 1970. During the afternoon, Sergeant Johnson appeared at the Johns residence and told plaintiff that he was going to take the children to his mother's home. Plaintiff thereupon called the sheriff and explained that her husband was dangerous. She urged her husband to seek treatment, saying that she would not return to him until he did so. He soon became calm and apologized to plaintiff and her brother. Later that day, he brought over some Christmas presents.

On January 4, 1971, Sergeant Johnson appeared at the Clinic with his mother. They met with Dr. Merideth, who noted that the sergeant was rambling, vague, and somewhat suspicious. At this meeting, Dr. Merideth learned for the first time that Johnson had stopped taking his medication. Accordingly, the doctor started him once again on small dosages of stelazine, two milligrams twice a day, and arranged another appointment for a few days later. On January 6, after arguing with his wife over the telephone, the sergeant went to the Johns residence, where he forced plaintiff to have sexual intercourse with him. The next day, Johnson returned to the Clinic, and Dr. Merideth prescribed continued dosages of stelazine; Sergeant Johnson did not mention the events of the previous day to Dr. Merideth at that time. By the evening of January 8, Johnson was in jail on two warrants which had issued on the basis of the events of January 6. He pleaded with plaintiff and her brother to drop the charges so that he could be released from jail; he promised to return to the post hospital if he was

---

**10.** These indications are found in the report of plaintiff's performance on the Minnesota Multiphasic Personality Inventory. This test is regarded as a valuable diagnostic aid, although its findings are not conclusive.

**11.** See *The Diagnostic and Statistical Manual of Mental Disorders* (2d ed., 1968) at 38. This is a publication of the American Psychiatric Association and is intended to encourage uniformity in nomenclature and classification.

released. Plaintiff called Dr. Merideth at his home that night to advise him of what had happened. She related that her husband had told her that he knew what he was doing but could not control himself. She also said that on December 26, 1970, her husband had threatened to shoot her. Dr. Merideth agreed that Sergeant Johnson could be released on the condition that he would report to the Clinic for treatment.

On Monday, January 11, 1971, Johnson's company commander, Captain John Copeland (who had been informed by Carroll Johns of the sergeant's release condition) personally escorted him to the Mental Health Clinic. Captain Copeland met with Dr. Merideth and informed him that he had recently been having a number of problems with Johnson, who was no longer performing satisfactorily in his unit; the captain said that he was becoming "fed up" with the whole situation.

Upon interviewing the sergeant, Dr. Merideth found him to be rather guarded and suspicious with vague somatic complaints. Johnson was placed in a private room. The dosages of stelazine and artane were resumed, and were supplemented by other medications. The sergeant was restricted to the private room until January 18, when he moved to an open ward from which he was discharged on January 21, 1971.[12] Dr. Merideth's progress notes for this hospitalization indicate the following: (1) January 12—no change; (2) January 14—tangential, guarded, will increase phenothiazine and continue supportive treatments; (3) January 15—no change; (4) January 18—gradually better, though has ideas of reference; (5) January 20—continues to improve, but rather guarded; (6) January 21—doing well. The daily nursing notes describe Sergeant Johnson's behavior with such words as "quiet" and "cooperative"; the only negative remark was that on two days (January 16 and 17) the sergeant was restless and complained of being lonely. During Johnson's stay at the hospital, Dr. Merideth conducted mental status examinations on almost a daily basis. His findings tended to show that Sergeant Johnson was not entertaining any homicidal or suicidal thoughts at the time of the examinations. These encouraging results were a major factor in Dr. Merideth's decisions to transfer the sergeant to the open ward without restrictions on January 18, and to release him three days later. At the time of Johnson's release on January 21, Dr. Merideth concluded that he was not dangerous to himself or others on the basis of his mental status, his general appearance, his behavior, his motor activity, his speech, his affect, his content, his sensorium, and his judgment. The discharge diagnosis was paranoid schizophrenia. Sergeant Johnson was placed on ten milligrams of stelazine twice a day, and four milligrams of artane twice a day. At his discharge conference with Sergeant Johnson, Dr. Merideth set up an appointment for January 26. The doctor noted in his discharge summary that Johnson was very reluctant to take his prescribed medications.[13] Dr. Merideth

---

12. Dr. Merideth's orders during the hospitalization were as follows: (1) Jan. 11—admit A-12; restrict to room; close observation; regular diet; routine lab; skull films; stelazine 5 mg. b.i.d.; artane 2 mg. b.i.d.; thorazine intramuscularly, as needed, every four hours for agitation; (2) Jan. 14—increase stelazine to 10 mg. b.i.d.; increase artane to 4 mg. b.i.d.; (3) Jan. 17—stelazine 10 mg. b.i.d.; artane 4 mg. b.i.d.; restrict to room plus observation; regular diet; thorazine 50 mg. every four hours p.r.n.; (4) Jan. 18—may transfer to A-16; (5) Jan. 21—discharged to duty; stelazine 10 mg. b.i.d.; artane 4 mg. b.i.d.

13. Dr. Merideth's narrative summary on discharge stated:

REASON FOR REFERRAL: This 23-year old, married, SGT E5 has been known to our clinic since 12 August 1970 when he was originally evaluated. He was hospitalized for the second time in six months because of marital difficulties, irritability, poor impulse control, and depression.

PRESENT ILLNESS: The patient has recently been experiencing marital difficulties which has added to his prevailing irritableness, poor impulse control and established delusional system. He was hospital-

also called Johnson's company to advise the personnel there that the sergeant was returning to duty.[14]

On January 12, 1971, while Sergeant Johnson was in the hospital, plaintiff went to see Dr. Merideth. She informed him that she was under Dr. Whitehurst's care. She also told the doctor that divorce proceedings were in progress, and asked for advice and medical records to aid her in these proceedings. Dr. Merideth refused to assist her because of ethical considerations. He also felt that Johnson's paranoia would be worsened by any suggestion that his wife and his psychiatrist were working against him behind his back.

At the time of Johnson's discharge from the hospital, his wife and their children were still living with Carroll Johns in Waynesville, Georgia, approximately eighty miles from Fort Stewart. Without her husband's knowledge, plaintiff had had the couple's house trailer moved from Hinesville to the Johns home. The sergeant no longer lived with his family and was residing in a barracks at the post. Fort Stewart was an open post, where military personnel could leave and enter without being stopped. In addition, the sergeant had an automobile on the post (though this was not known to Dr. Merideth) and was free to leave when not on duty. On the day he left the hospital, Johnson telephoned the house in Waynesville. Later the same day, he spent about half an hour with his wife and children in the presence of

Carroll Johns and his family. At this time, he told his wife that he was feeling much better, that he was taking his medicine, that he felt he could appreciate his children, and that he wished to be reunited with his family. On the afternoon of Saturday, January 23, the sergeant returned to the Johns residence to visit his wife and children. He again spoke with his wife about a possible reconciliation, admitted that he had been wrong, and expressed a strong desire to have his family back together. After dinner, he played with the children. He then spent the night at the Johns residence with his wife and left about ten o'clock on Sunday morning.

Sergeant Johnson went to Captain Copeland on January 25 and requested a leave to enable him to straighten out his domestic affairs. While the captain noted that Johnson seemed to have improved, he did not feel that the sergeant should go on leave; he, therefore, denied the request. Johnson then appealed the decision to Major Franklin Peterson, the acting battalion commander. To Major Peterson, the sergeant appeared to be rational, in control of himself, and neither hostile nor abusive. Johnson described some of the family problems which he said required his attention, in particular the fact that his wife had recently moved the family's house trailer to her brother's home. Knowing that the sergeant had recently been hospitalized, Major Peterson called the Clinic to ascertain whether there was any medical

---

ized and immediately placed on Stelazine, 5 milligrams, BID. It is important to note that the patient is very reluctant to taking his medication.
*REVIEW OF SYSTEMS*: Negative.
*PHYSICAL EXAMINATION*: Temperature, 99.8; Pulse, 100; Blood pressure, 122/78.
*LABORATORY DATA*: Within normal limits.
*COURSE IN HOSPITAL*: Improved.
*FINAL DIAGNOSIS*: Paranoid schizophrenia.
*DISPOSITION AND RECOMMENDATIONS*: The patient will be seen at MHCD on an outpatient basis and his discharge medications were Stelazine, 10 milligrams, BID, and Artane, 4 milligrams, BID.

14. The Court rejects Captain Copeland's testimony to the effect that on January 21, 1971, when Johnson was discharged, Dr. Merideth told the captain that Sergeant Johnson was neither competent nor responsible for his actions. Similarly, the Court finds that Copeland did not communicate this evaluation of Johnson to Major Franklin Peterson on January 25. The language attributed to Dr. Merideth is strikingly similar to that in the "line of duty" report which the doctor prepared after Johnson's death. In the Court's view, Captain Copeland's recollection has confused events just before and just after the shootings.

reason why Johnson should not be granted leave; Dr. Merideth told him that there was none. Major Peterson then telephoned the sergeant's company, spoke to either Captain Copeland or Sergeant Garro (the company's first sergeant) and directed that Sergeant Johnson be granted leave to allow him to take care of his domestic worries. On January 26, 1971, Johnson called the Clinic and changed his previously scheduled appointment from that morning to January 28. Later that day, he telephoned his wife, and the couple became embroiled in a bitter argument about their mutual threats of divorce proceedings. The argument erupted again the next morning, when Sergeant Johnson met with plaintiff in Carroll Johns' office. In the evening, after another heated telephone conversation, Johnson took a shotgun to the house in Waynesville, murdered Carroll Johns by firing at him through a window, wounded plaintiff after finding her in a bedroom, and then committed suicide by shooting himself with the same weapon.

▇▇ Plaintiff contends that these facts establish the Government's negligence in failing to treat Sergeant Johnson's illness properly and in allowing him to leave the Clinic and the post after his January hospitalization. This is essentially a medical malpractice suit; it is obvious to the Court that all the negligent acts alleged by plaintiff relate to the medical care which Johnson received for his mental condition.[15] In actions under the Federal Tort Claims Act, the parties' substantive rights are determined by the law of the state in which the cause of action arose. See, *e.g.*, *Barnes v. United States*, 349 F.2d 553, 555 (5th Cir. 1965). It is therefore to the Georgia law of medical malpractice that this Court must turn for the controlling legal principles. Under Georgia law, a physician must bring to the practice of his profession a "reasonable degree of care and skill", Georgia Code, Section 84–924. The requisite standards of professional care and skill are those ordinarily employed by the medical profession generally in similar situations.[16] See, *Hayes v. Brown*, 108 Ga.App. 360, 133 S.E.2d 102, 104–05 (1963). There is a presumption that medical services were performed in a skillful manner, and the burden is on the plaintiff to show a want of due care, skill, and diligence. See *Shea v. Phillips*, 213 Ga. 269, 98 S.E.2d 552, 554 (1957). A physician is not an insurer of a successful cure; he may decide which of two or more approved methods to use in treating a patient, and will not be liable for honest mistakes or errors of judgment so long as he was exercising a reasonable degree of care and skill. See *Hopper v. McCord*, 115 Ga.App. 10, 153 S.E.2d 646, 647 (1967); *Bryan v. Grace*, 63 Ga.App. 373, 11 S.E.2d 241, 244–45 (1940). The Georgia cases have not established a specific standard for the release of mental patients from restrictions. However, the statutory scheme for treatment of the mentally ill clearly indicates a legislative intent that psychiatric patients be treated as responsible human beings, with no more restrictions than good medical

---

**15.** This is true even as to the decision to grant leave to Sergeant Johnson on January 25, 1971, since Major Peterson based this decision upon Dr. Merideth's professional opinion that there was no reason to deny the leave.

**16.** No persuasive reason has been suggested to the Court why Dr. Merideth should be held to a different standard of care merely because he was a military physician. Plaintiff has drawn the Court's attention to several army regulations and policy statements concerning the treatment of mental patients. After a careful study of these documents, the Court has concluded that nothing therein adds to the responsibilities imposed on a psychiatrist by Georgia law; nor is there any provision which is intended to pre-empt state law. The provisions are merely general statements of sound medical principles and as such duplicate the standards set by the Georgia law of malpractice. Also, because of the Court's conclusion that there was no actionable malpractice in this case, it is unnecessary to consider defendant's contention that the provisions of Georgia Code, Chapter 88–5, require proof of more than malpractice for liability to be imposed because of the release of a mental patient.

practice requires.[17] Although none of these provisions addresses the specific issues before this Court, the liberal legislative intent is relevant to any determination of how the general principles of Georgia malpractice law should be applied in the context of psychiatric care.

 With such guiding principles in mind, the resolution of these cases becomes clear. ⁵The evidence before this Court establishes that it is sound psychiatric practice to emphasize outpatient therapy rather than lengthy custody and supervision. Modern psychiatry has recognized the importance of making every reasonable effort to return a patient to an active and productive life. Thus, the patient is encouraged to develop his self-confidence by adjusting to the demands of everyday existence. In this view, mental hospitals are not seen as dumping grounds for all persons whose behavior society might find inconvenient or offensive; institutionalization is the exception, not the rule, and is called for only when a paramount therapeutic interest or the protection of society leaves no choice. Furthermore, all the expert witnesses for both parties agreed that accurate predictions of dangerous behavior, and particularly of suicide and homicide, are almost never possible. Especially in view of this fact, the Court is persuaded that modern psychiatric practice does not require a patient to be isolated from normal human activities until every possible danger has passed. Because of the virtual impossibility of predicting dangerousness, such an approach would necessarily lead to prolonged incarceration for many patients who could become useful members of society. It has also been made clear to the Court that constant supervision and restriction will often tend to promote the very disorders which they are designed to control. This is especially true when the patient is suffering from paranoia and might view his custodians as members of a "paranoid pseudo community" which is forming against him. On the other hand, despite the therapeutic benefits of this "open door" approach, the practice admittedly entails a higher potential of danger both for the patient and for those with whom he comes in contact. In deciding the extent to which a patient should be released from restrictions, the treating physician must exercise his judgment and balance the various therapeutic considerations together with the possible dangers. The emergence of the "open door" policy and of the balancing test which it requires has been recognized in numerous decisions. See, e.g., *Lucy Webb Hayes Nat'l Training School v. Perotti*, 136 U.S.App.D.C. 122, 419 F.2d 704, 707–08 (1969); *Eanes v. United States*, 407 F.2d 823, 824 (4th Cir. 1969); *White v. United States*, 244 F.Supp. 127, 131, 134 (E.D.Va.1965), aff'd per curiam, 359 F.2d 989 (4th Cir. 1966); *Baker v. United States*, 226 F.Supp. 129, 132, 134–35 (S.D.Iowa 1964), aff'd, 343 F.2d 222 (8th Cir. 1965); *St. George v. State*, 283 App.Div. 245, 127 N.Y.S.2d 147, 150–51 (App.Div.), aff'd, 308 N.Y. 681, 124 N.E.2d 320 (1954). The Court is aware that some psychiatrists adhere to the older, more custodial approach. However, it has been proved to the Court's satisfaction that the "open door" policy and the judgmental balancing test are an accepted method of treatment. Therefore, no liability can arise merely because a psychiatrist favors the newer over the older approach. See *Bryan v.*

---

17. See, e.g., Georgia Code, Section 88–502.1 (protection of patients' rights); Section 88–502.8 (employment outside the institution); Section 88–502.11 (habeas remedy for unjustified detention); Section 88–503.3 (right of voluntary patients to discharge on application); Section 88–503.4 (notice to patient of his rights to release); Section 88–506.6 (stringent procedural requirements for continuing hospitalization after initial six-month period). All of these provisions were effective by January 1, 1970, prior to the events which led to the cases presently under consideration. In applying these provisions, the Georgia courts have construed them strictly in favor of the patient and have emphasized the legislature's concern to protect mental patients' dignity. See, e.g., *Trapnell v. Smith*, 131 Ga.App. 254, 205 S.E.2d 875 (1974).

Grace, supra, at 244. The question then becomes whether Dr. Merideth's judgment was negligently exercised. The Court concludes that it was not.

It is alleged that Sergeant Johnson's September and January hospitalizations were too short and that too few restrictions were imposed upon the patient after each release. These contentions must be rejected. The evidence before this Court shows that paranoid schizophrenia is essentially an incurable disease. However, the disease exhibits patterns of exacerbation and remission, and it is sound psychiatric practice to hospitalize a patient when his symptoms are exacerbated and then to place him in a more normal environment when his symptoms are in remission. This is the practice which Dr. Merideth followed in treating Sergeant Johnson. Twice, when a period of exacerbation became evident, the patient was placed in a secure hospital room. As, in the doctor's judgment, the crisis passed and Johnson's symptoms began to remit, the patient's privileges were gradually restored. The January hospitalization, upon which plaintiff's attacks are particularly concentrated, is in fact a clear example of this sound psychiatric technique. As the patient's condition improved, he went from a secure room to an open ward and then, after several days of successful adjustment in the open ward, he was returned to duty. Antipsychotic medications, of proven value in treating paranoid schizophrenia, were used in gradually increased dosages and were apparently taking effect. Frequent mental status examinations were conducted, and showed a steady progress towards remission as well as an absence of suicidal or homicidal thoughts. The patient was a non-commissioned officer who, except when his disease was entering a period of exacerbation, had always performed well in his unit. A thorough examination of the patient prior to discharge tended to show that his symptoms were in remission and that he was not dangerous to himself or others. Furthermore, Johnson was a paranoid patient whose condition could well be worsened by prolonged custody and constant supervision. This Court is unable to say that Dr. Merideth negligently weighed these factors. In the Court's opinion, the doctor, in the exercise of ordinary care, could reasonably have concluded that the therapeutic benefits of release far outweighed the possibility of violence. Any error was at most an error of judgment and thus not actionable under Georgia law.[18] See Bryan v. Grace, supra, at 244–45. This conclusion applies a fortiori to the September hospitalization, when comparable therapy was provided and the patient had exhibited fewer signs of dangerousness. Nor is the Court persuaded that the follow-up treatment after the hospitalizations was inadequate. At the time of each release, the patient was placed on effective antipsychotic medication. Outpatient visits to the Mental Hygiene Clinic were scheduled within a short time after each discharge, and the Court credits the trial testimony to the effect that it is entirely normal for such post-release interviews to be conducted by social workers with Specialist Ligotti's approximate qualifications. These visits were held on a regular basis between the two periods of hospitalization, and were to resume within a week after the sergeant's release in January. It is urged upon the Court that this combination of medicine and outpatient visits was insufficient, and that any doctor exercising ordinary care would have imposed greater restrictions. The Court is unpersuaded that ordinary care required any of the further restrictions which have been suggested by plaintiff. Thus, the Court rejects the contention that it was negligent for Dr.

---

18. Plaintiff's witnesses offered a number of reasons why this balance was struck incorrectly. For example, it was noted that Johnson appeared "rather guarded" to Dr. Merideth on the day before his release. There was testimony that such "guardedness" is frequently a sign that a patient is masking his symptoms in hope of a faster release from the hospital. The Court has carefully examined this and every other criticism of Dr. Merideth's conduct and has concluded that none of the criticisms, even if true, could raise the doctor's decision from the level of questionable judgment to the level of negligence.

Merideth not to have restricted Sergeant Johnson to the post and not to have forbidden leave after his release in January. This argument is alleged to follow from the sergeant's "dangerousness" and from the fact that Johnson's illness was "situational"—i. e., contact with his nearby family would place him in a "situation" which aggravated his disease. There is no merit in this argument. Once Dr. Merideth in his judgment had concluded that Johnson's symptons were in remission, it was entirely proper to give the patient maximum freedom of movement as he resumed the process of adjusting to life's problems on the outside. The patient was to be followed up at short intervals in the Mental Hygiene Clinic, and the doctor could reasonably have felt that these follow-up visits would show when a new period of exacerbation was imminent and when therefore some greater restriction might be called for.[19] Similarly, the Court cannot find that Dr. Merideth was negligent in not transferring Johnson to another facility. It has not been shown that a different Army hospital would have provided another type of treatment, and plaintiff's witnesses did not convince the Court that it is usual practice to take this drastic action merely to separate a patient from a family situation which might exacerbate the patient's symptoms. There are also allegations to the effect that Dr. Merideth should have more closely supervised his patient's use of the prescribed medications. For example, it is said that Johnson should have been ordered to report to the Clinic or to his commander and take his medication in the presence of a military superior. Nothing in the record would support a conclusion that such strong-arm tactics are ordinary medical practice in the military or anywhere else.[20] Doctors routinely rely upon their patient's willingness and ability to follow prescriptions. In the present cases, Dr. Merideth could justifiably have felt that frequent follow-up meetings at short intervals would bring to light any problems in this regard.[21]

The Court's conclusion that Sergeant Johnson received adequate treatment is further confirmed by a review of the care which plaintiff was given by Dr. Whitehurst, one of her own expert witnesses. Plaintiff was hospitalized after her relatives became alarmed at her suicidal and homicidal statements; she expressed suicidal thoughts at the time of her admission to the hospital, and repeated them during her stay in the psychiatric ward. Despite these indications of possible danger, plaintiff's hospitalization lasted just fourteen days. This term was only negligibly longer than the hospitalizations of Sergeant Johnson, who had manifested no suicidal or homicidal tendencies while in custody. To the Court, Dr. Whitehurst's own practice, as opposed to his critique of Dr. Merideth, indicates that long hospitalizations are in fact exceptional, even for patients who might be dangerous upon release. The Court credits the trial testimony of Dr. George W. Barnard that there was no significant difference, from a medical standpoint, between the tim-

---

**19.** Moreover, this contention appears to overlook the fact that Johnson's illness was essentially incurable. If denying Johnson access to his relatives was a necessary precaution because of his "situational" illness, the stringent restrictions suggested by plaintiff (continued hospitalization, constant restriction to post, or the like) would have had to have been permanent in order to have been effective. Plaintiff has not shown that the "situational" aspects of Johnson's disorder would have abated with time. The likelihood of Johnson's trying to contact his relatives and thus renewing the aggravating "situation" would have been present indefinitely. The Court is totally unpersuaded that the permanent restrictions which alone could have avoided this possibility were required by ordinary medical practice.

**20.** The Court is also mindful of the antitherapeutic dangers of seeming to draw other persons, such as the company commander, into a patient's "paranoid pseudo-community".

**21.** Dr. Merideth stated in Johnson's January discharge report that it was important to note the patient's reluctance to take his medication. This entry strongly suggests that Dr. Merideth was planning to monitor the sergeant's use of the medicine more closely than was done the preceding autumn, when Dr. Merideth had not been aware of the sergeant's reluctance to follow the prescription.

ing of plaintiff's release and the timing of Sergeant Johnson's two discharges. Both patients had shown sufficient improvement that it was proper to allow them to attempt an adjustment to a normal environment. Also, in at least one important aspect the treatment provided by Dr. Whitehurst would seem to have been less complete than Dr. Merideth's. Although both patients suffered from serious psychoses[22], only Sergeant Johnson was placed on antipsychotic medication as an out-patient. It is also noteworthy that both diseases were of the "situational" type, and that in each case the family environment was the "situation" which aggravated the disease. Despite this knowledge, Dr. Whitehurst allowed plaintiff to return to her children (whom she had spoken of killing) and to the Waynesville home, which was within a short drive of her husband's residence[23]. Once again, the actual practice of plaintiff's own expert contradicts a theory which plaintiff is urging upon this Court. Both doctors allowed their patients to return to the very environment where the strong "situational" components of their diseases were likely to be aggravated. If Dr. Merideth was negligent in this respect, Dr. Whitehurst would seem to have been no less so. These remarks are not intended as a criticism of Dr. Whitehurst's treatment of plaintiff. The Court believes that both doctors followed the ordinary standards of their profession. In the Court's view, the significance of Dr. Whitehurst's own practice is that it tends to confirm the propriety of the care which Dr. Merideth provided to Sergeant Johnson.

In summary, the Court concludes that the facilities and personnel at Fort Stewart were adequate to treat Sergeant Johnson's illness, that no agent of the Government acted negligently with regard to any aspect of these cases, and that in particular, Dr. Merideth exercised a reasonable degree of care and skill in the treatment which he provided. Therefore, the Government cannot be held liable for the injury to plaintiff or for the death of her husband[24]

**22.** After Dr. Whitehurst testified that plaintiff was neurotic rather than psychotic, it was brought out on cross-examination that Dr. Whitehurst's own discharge diagnosis was of a psychotic disorder. See note 11 *supra,* and accompanying text. In the Court's opinion, this confusion tends to reduce the weight which should be given to Dr. Whitehurst's testimony.

**23.** Moreover, as noted in the findings of fact *supra,* in December 1970 at the Memorial Hospital in Jacksonville, Dr. Whitehurst had happened to witness the type of explosive situation which could result when husband and wife confronted one another.

**24.** Plaintiff has drawn the Court's attention to a number of decisions which are alleged to control this one or at least to be persuasive. The Court has found each of these to be highly dissimilar to the cases presently under consideration. In the present cases, there were no violations of military regulations, or departures from normal military practice, as in *Underwood v. United States,* 356 F.2d 92, 98–99 (5th Cir. 1966) and *United States v. Shively,* 345 F.2d 294, 296 (5th Cir. 1965). Nor was there the negligence in medical treatment which characterized the *Underwood* case, where, for example, the patient's prior history was withheld from his treating psychiatrist. Similarly wide of the mark is *Fair v. United States,* 234 F.2d 288 (5th Cir. 1956), in which the military failed to carry out its promise to warn a detective agency that had agreed to protect a soldier's intended victims. The grossly negligent, almost wanton conduct of the medical authorities in *Merchants Nat'l Bank & Trust Co. v. United States,* 272 F.Supp. 409 (D.N.D.1967) bears not even the slightest resemblance to the facts of the present cases.

Because of the Court's conclusion that there was no negligence in these cases, the Court will not pass upon the other issues raised by defendant, including the question of proximate causation under Georgia law and whether the doctrine of *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950), bars recovery in Case Number 71–922–Civ–J–T.